# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

| | |
|---|---|
| ERWIN GAA, derivatively on behalf of ROCKET COMPANIES, INC., | Case No.: |
|       Plaintiff, | |
|       v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| DANIEL GILBERT, JAY D. FARNER, JULIE R. BOOTH, ROBERT DEAN WALTERS, MATTHEW RIZIK, SUZANNE SHANK, JENNIFER GILBERT, JONATHAN MARINER, NANCY TELLEM, and ROCK HOLDINGS INC., | |
|       Defendants, | **DEMAND FOR JURY TRIAL** |
|       and | |
| ROCKET COMPANIES, INC., | |
|       Nominal Defendant. | |

## INTRODUCTION

Plaintiff Erwin Gaa ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Rocket Companies, Inc. ("Rocket" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Daniel Gilbert ("Daniel Gilbert"), Jay D. Farner ("Farner"), Julie R. Booth ("Booth"), Robert Dean Walters ("Walters"), Matthew Rizik ("Rizik"), Suzanne Shank ("Shank"), Jennifer Gilbert ("Jennifer Gilbert"), Jonathan Mariner ("Mariner"), Nancy Tellem ("Tellem") (collectively, the "Individual Defendants"), and Rock Holdings Inc. ("RHI" and together with Rocket and the Individual Defendants, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Rocket, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Daniel Gilbert, Farner, Booth, and Walters and RHI for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rocket, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 25, 2021 through May 5, 2021, both dates

2

inclusive (the "Relevant Period").

2.      Rocket is a digital mortgage origination company that operates through two main business segments: the Direct to Consumer ("DTC") channel and the Partner Network channel. The DTC segment is significantly more profitable, producing a higher "Gain on Sale," because it involves direct engagement with consumers. In contrast, the Partner Network segment relies on referrals from third-party brokers, requiring Rocket to share a portion of the profits, which reduces overall margins.

3.      Rocket originates two main categories of mortgage loans: refinancing loans and new purchase loans. Demand for refinancing loans is closely tied to interest rate trends, since, when rates drop, homeowners are more inclined to refinance to secure lower payments. Historically, refinancing loans have made up the bulk of Rocket's business. Indeed, in 2020, around 80% new loan applications were for refinancing, while only about 20% were new purchase loans.

4.      Rocket generates revenue primarily by originating mortgage loans and selling them to consumers, mostly purchased by government-sponsored enterprises ("GSEs") like Fannie Mae and Freddie Mac. These GSEs bundle the loans into mortgage-backed securities ("MBS"), which are then sold to investors on the secondary market. Rocket profits from the "primary-secondary spread," which is the difference between the interest rate charged to borrowers (the primary rate) and the yield on newly issued MBS (the secondary rate). After accounting for costs like guarantee and servicing fees, this spread reflects the profit margin for mortgage originators like Rocket.

5.      Throughout the Relevant Period, Rocket publicly claimed it was experiencing "strong consumer demand" and that rising interest rates would not impact its mortgage business.

However, in reality, the Defendants were aware, through their continuous monitoring of key performance indicators and access to extensive internal data, that demand for loans had begun to decline as early as November 2020. This drop led to fewer closed loans available for sale in the secondary market and a shift in volume toward the less profitable Partner Network segment. Additionally, as interest rates began rising in February 2021, refinance activity, the primary source of loan originations for Rocket, fell sharply. The rate increase also reduced Rocket's ability to sell loans at favorable pricing in the secondary market, significantly shrinking the primary-secondary spread and causing a steep decline in its Gain on Sale margin, a key measure of the Company's profitability.

6.      During a Board meeting on March 23, 2021, Defendant Daniel Gilbert was presented a Bord report detailing a forecasted decline of the Gain on Sale margin from 3.5% to 3.19% for the full year of 2021, an expected reduction in nearly a billion dollars in revenue for the year, a significant reduction in refinancing volume, and compression of the primary-secondary spread. Six days later, on March 29, 2021, while in possession of this material nonpublic information, Defendant Daniel Gilbert, through RHI, sold 20.2 million shares of Company stock for **total proceeds of approximately $500 million**.

7.      The truth fully emerged on May 5, 2021 when Defendants surprised the market by announcing Rocket's guidance for the second quarter of 2021, projecting closed loan volume between $82.5 billion and $87.5 billion and a Gain on Sale margin of 2.65% to 2.95%. At the midpoint, the projected loan volume marked a significant $18.5 billion drop from the actual volume in the first quarter of 2021. The mid-range Gain on Sale margin represented a year-over-year decline of 239 basis points and a sequential drop of 94 basis points, marking Rocket's lowest quarterly Gain on Sale margin in two years.

8.      On this news, the price of the Company's stock fell $3.79 per share, or approximately 16.7%, from a closing price of $22.80 per share on May 5, 2021 to close at $19.01 per share on May 6, 2021. By May 11, 2021, the price of Class A common stock continued to decline to hit $16.48 per share.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) during the Relevant Period, Rocket's business remained heavily reliant on refinancing as its primary source of closed loan volume, making the Company particularly dependent on continued refinancing activity; (2) Rocket was especially sensitive to fluctuations in interest rates because: (i) refinancing volume significantly declines as interest rates rise; (ii) lower refinancing volume directly results in reduced revenue; (iii) higher interest rates diminish Rocket's profitability and Gain on Sale margin; (iv) rising rates compress the primary-secondary spread, further reducing profit margins; and (v) Rocket had acknowledged that its financial performance is directly affected by changes in prevailing interest rates; and (3) maintaining strong loan volume would require targeting clients less sensitive to interest rates, and that compression in the primary-secondary spread was already negatively affecting its profitability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions

of material fact, while, during the Relevant Period, one of the Individual Defendants sold Company shares at inflated prices for ***total proceeds of approximately $500 million***.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its current and former officers and/or directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Michigan (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action, of the officers' and/or directors' and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

<u>**JURISDICTION AND VENUE**</u>

6

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Rocket. Plaintiff has continuously owned Rocket common stock at all relevant times.

### Nominal Defendant Rocket

20.     Rocket is a Delaware corporation with its principal executive offices at 1050 Woodward Avenue, Detroit, Michigan 48226. Rocket's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RKT."

### Defendant Daniel Gilbert

21.    Defendant Daniel Gilbert has served as the Company's Chairman of the Board since March 2020. He is the Founder and former CEO of Rocket. During the Relevant Period, and at all relevant times, Defendant Daniel Gilbert has served as Chairman of the Board and a majority holder of Rock Holdings, Inc. ("RHI"), which is Rocket's majority shareholder. According to the proxy statement that the Company filed with the SEC on May 29, 2025 (the "2025 Proxy Statement"), as of May 20, 2025, Defendant Daniel Gilbert beneficially owned 1,848,879,483 shares of the Company's Class D common stock. Given that the price per share of the Company's common stock at the close of trading on May 20, 2025 was $13.17, Defendant Daniel Gilbert owned approximately $24.3 billion worth of Rocket common stock as of that date.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Daniel Gilbert made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/29/2021 | 20,200,000 | $24.75 | $499,950,000 |

Thus, in total, before the fraud was exposed, he sold 20.2 million shares of Company common stock on inside information, for which he received **_approximately $500 million in proceeds_**. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

23.    The 2025 Proxy Statement stated the following about Defendant Daniel Gilbert:

Dan Gilbert is the Chairman of our Board. Dan is the founder of Rocket Mortgage, where he is currently a manager and served as Chairman of the board of directors from 1985 to 2020. He also served as the Chief Executive Officer of Rocket Mortgage from 1985 to 2002. Prior to the Up-C Collapse, Dan is the majority owner of RHI, and the Chairman of its board of directors, a position he has held since 2002. Dan was appointed as CEO and President of RHI in March 2023, and Dan also serves in officer and director roles for certain RHI affiliates. Dan is the majority

8

owner of the NBA Cleveland Cavaliers basketball team and the operator of the Rocket Arena in Cleveland, Ohio. Furthermore, he is the Chairman of ROCK and majority shareholder and founder of the real estate investment firm Bedrock, which has invested and committed billions to acquiring and developing more than 100 properties, including new construction of ground up developments in downtown Detroit and Cleveland, and totaling more than 18 million square feet in Detroit's downtown urban core. In February 2016, Dan co-founded Detroit-based StockX, the world's first "stock market of things," combining the visible, liquid, anonymous, and transparent benefits of a stock market with the online consumer secondary market. In 2015, Dan and Jennifer Gilbert established the Gilbert Family Foundation and in 2017, formed NF Forward to fund cutting-edge research dedicated to finding a cure for neurofibromatosis (NF). Dan earned his Bachelor's degree from Michigan State University and his law degree from Wayne State University

As our founder and Chairman and a national leader in the mortgage industry, Dan has provided us with critical leadership during our entire 40-year history, including his service as Chief Executive Officer from 1985 until 2002. In that role, he pioneered the digitization of mortgages in America, revolutionized the mortgage industry, and created our ISMs as the guiding principles and philosophy for our team members, which continue to define our corporate culture as well as fundamental corporate strategies and innovation. Our Board also benefits from his in-depth industry knowledge and significant relationships with key business partners and national business leaders.

**Defendant Farner**

24.     Defendant Farner served as the Company's CEO from 2017 until June 2023. He also served as Vice Chairman of the Board from March 2020 until February 8, 2023.

25.     For the 2021 Fiscal Year, Defendant Farner received $1,603,475 in total compensation from the Company.

26.     The proxy statement that the Company filed with the SEC on April 14, 2021 (the "2021 Proxy Statement") stated the following about Defendant Farner:

Jay Farner is our Chief Executive Officer and Vice Chairman of our Board. Prior to that, Jay has been with Rocket Mortgage since 1996, and as a senior leader since 1999. Immediately prior to his promotion to CEO of Rocket Mortgage in 2017, Jay served as President and Chief Marketing Officer of Rocket Mortgage. Jay also serves as Chief Executive Officer and Director of RHI, our principal stockholder, since 2017 and certain of its affiliates. Jay serves as a board member of Detroit Labs, LLC, Community Solutions, StockX, Bedrock Manufacturing, Rock

Ventures LLC, Bedrock, the Metropolitan Detroit YMCA, Bizdom Fund and Rocket Giving Fund (where he also serves as President). Jay earned a bachelor's degree in finance from Michigan State University.

With over 25 years of experience with the Company and currently serving as our Chief Executive Officer, Jay has a unique perspective and understanding of our business, culture and history, having provided strong leadership for our Company through many economic cycles, internal and external growth and other key operational and strategic initiatives. His ongoing day-to-day leadership gives him critical insights into our operations, strategy and competition, and allows him to facilitate the Board's ability to perform its critical oversight function.

### **Defendant Booth**

27.     Defendant Booth served as the Company's Chief Financial Officer ("CFO") and

Treasurer from March 2020 until November 15, 2022.

28.     The 2021 Proxy Statement stated the following about Defendant Booth:

**Julie Booth** is our Chief Financial Officer and Treasurer. Julie has held these positions since March 2020. Previously she held positions with Rocket Mortgage leading its accounting and finance teams as Vice President, Finance and Treasurer from 2005 to 2010 and Chief Financial Officer and Treasurer from 2010 to March 2020. She is responsible for the accounting, finance, treasury, tax and investor relations functions, and she assists with the internal audit function. Prior to joining Rocket Mortgage, she was a senior manager with Ernst & Young LLP in Detroit, where she had 13 years of experience serving banking and mortgage banking clients in the assurance practice. She currently serves as the board Chair for Make-A-Wish Michigan and previously served as Chair for the Mortgage Bankers Association Financial Management Committee. Julie earned a bachelor's degree in accounting from the University of Michigan and is a Certified Public Accountant.

**FAVORITE ISM: You'll See It When You Believe It.**

### **Defendant Walters**

29.     Defendant Walters served as the Company's President and Chief Operating

Officer ("COO") from March 2020 until he retired on September 5, 2023.

30.     The 2021 Proxy Statement stated the following about Defendant Walters:

**Bob Walters** is our President and Chief Operating Officer. Bob has held these positions since March 2020. In these positions, Bob oversees the day to day operations of the business, focusing on strategic planning and leveraging synergies

among various operational teams at the Company. Most recently, Bob has served as President and Chief Operating Officer of Rocket Mortgage since 2017. From August 2016 to February 2017, Bob served as Chief Economist and Executive Vice President of Rocket Mortgage overseeing the Capital Markets and Servicing operations. Bob has been instrumental in leading the teams that manage interest rate risk management, trading and product development. Bob joined Rock Financial in 1997 after holding positions at both the National Bank of Detroit and DMR Financial Services. Bob earned his master's degree in business administration from the University of Michigan and his undergraduate degree in finance from Oakland University.

**FAVORITE ISM: Innovation Is Rewarded. Execution Is Worshipped.**

**<u>Defendant Rizik</u>**

31.     Defendant Rizik has served as a Company director since March 2020. He also serves as the Chair of the Compensation Committee and as the Chair of the Nominating and Governance Committee. For the 2021 Fiscal Year, Defendant Rizik received $346,000 in total compensation from the Company.

32.     The 2025 Proxy Statement stated the following about Defendant Rizik:

Matthew Rizik is a member of our Board as well as a director of RHI. The Company has also engaged Matthew as a consultant since 2020. Matthew's compensation is provided entirely pursuant to his role as a consultant, and he is not compensated additionally for his service on the Board or as a director of RHI. Matthew joined RHI in 2012 as the Chief Tax Officer and is currently Treasurer, Chief Financial Officer and Chief Tax Officer. In February 2023, Matthew was appointed as the Chief Executive Officer of ROCK. Prior to joining RHI, Matthew was a tax partner with PricewaterhouseCoopers LLP in Detroit, where he had over 31 years of experience serving Fortune 500 public companies. Matthew currently serves as a board member of ROCK, Bedrock, Rocket Mortgage, Rocket Classic, the Cleveland Cavaliers, the Motown Museum Legacy Council, City Year, Gilbert Family Foundation, Rocket Giving Fund and NF Forward. Matthew is a Certified Public Account and is a member of the American Institute of Certified Public Accountants and the Michigan Association of CPAs. Matthew earned a Bachelor's degree in Accounting and a Master's degree in Business Administration from Michigan State University.

Matthew is qualified to serve as a member of our Board due to his significant senior leadership experience in the areas of accounting and tax. As Chief Financial Officer of RHI with prior experience serving prominent companies in the banking and mortgage industries, his significant knowledge and experience brings important

perspective on our business strategy, operating structure, operations and general industry conditions

**Defendant Shank**

33.     Defendant Shank has served as a Company director since August 2020. She also serves as a member of the Audit Committee and the Nominating and Governance Committee. For the 2021 Fiscal Year, Defendant Shank received $252,552 in total compensation from the Company.

34.     The 2025 Proxy Statement stated the following about Defendant Shank:

Suzanne Shank is a member of our Board. Suzanne is the President, CEO and co-founder of Siebert Williams Shank & Co., LLC, a full-service investment banking firm offering debt and equity origination services to a wide range of Fortune 500 companies and debt underwriting for municipal clients nationally. She has held this role since 2019. Previously, Suzanne was Chairperson and CEO of Siebert Cisneros Shank & Co., L.L.C., a firm which she co-founded in 1996.  Suzanne currently serves as a board member of CMS Energy and Consumers Energy as well as White Mountains Insurance Group Ltd., and also serves on private company boards of the Kresge Foundation, the Skillman Foundation, the Detroit Regional Chamber (Executive Committee), Partnership for New York City, and the Spelman College Board of Trustees. She formerly served on the board of SIFMA, the SEC's Fixed Income Market Structure Advisory Committee, the Municipal Securities Rulemaking Board and the Bipartisan Policy Center's CEO Council on Infrastructure. Suzanne earned a Bachelor's degree in Civil Engineering from the Georgia Institute of Technology and a Master's degree in Business Administration from the Wharton School, University of Pennsylvania.

Suzanne's senior leadership experience in the financial services industry is of particular importance to our Board given the Company's ongoing business and strategy. Further, her experience as a current and former director of other public companies provides our Board with an important perspective on many fundamental areas of oversight, including governance, finance, accounting, stockholder engagement and risk management. Our Board has determined that she qualifies as an audit committee financial expert under SEC rules.

**Defendant Jennifer Gilbert**

35.     Defendant Jennifer Gilbert has served as a Company director since March 2020, and she is the wife of Defendant Daniel Gilbert. Defendant Jennifer Gilbert also serves as a

12

member of the Nominating and Governance Committee.

36.     The 2025 Proxy Statement stated the following about Defendant Jennifer Gilbert:

Jennifer Gilbert is a member of our Board. Jennifer is the wife of Dan Gilbert. Jennifer has been a director of RHI since 2019 and currently serves as a board member of ROCK and the Gilbert Family Foundation. With more than 20 years of experience in interior design, Jennifer Gilbert has evolved her expertise to serve as the Founder and Creative Director of Detroit-based POPHOUSE, a commercial design firm specializing in utilizing data and industry research to provide cutting-edge workplaces for clients across a broad spectrum of industries since 2013. Jennifer also founded Amber Engine in 2015, a Detroit-based home furnishings services and solutions technology company. Amber Engine's mission is to provide the most accurate, complete and timely record of product data for the $275 billion home furnishings industry through its easy-to-use, flexible and affordable cloud-based SaaS solutions. Amber Engine was sold to Material Bank in March 2022. Prior to Amber Engine, Jennifer founded Doodle Home, a digital platform for residential interior designers. Doodle Home was sold to Dering Hall in 2015. Jennifer is active with a number of non-profits focused on the arts, Jewish causes and finding a cure for neurofibromatosis (NF). She is President of NF Forward, Chair of the Cranbrook Academy of Art Board of Governors. Jennifer founded the Detroit Art Collection to beautify and inspire public spaces and structures in downtown Detroit with sculptural and mixed media works from local, as well as national artists, galleries and dealers. Jennifer earned her Bachelor of Arts in Interior Design at Michigan State University.

As a founder of companies focused on delivering a strong client experience surrounding data, research and technology-driven solutions, Jennifer contributes to our Board her significant business and leadership experience in the areas of innovation and technology, entrepreneurship and strategic thinking and client experience. Further, her commitment to notable non-profit businesses serving key community needs provides her insight to the key drivers and importance of culture, sustainability and human capital.

**Defendant Mariner**

37.     Defendant Mariner has served as a Company director since March 2020. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. For the 2021 Fiscal Year, Defendant Mariner received $201,584 in total compensation from the Company.

38.     The 2025 Proxy Statement stated the following about Defendant Mariner:

Jonathan Mariner is a member of our Board. Jonathan has served as the Founder and President of TaxDay, LLC, a mobile residency tax tracking application, since April 2016. Jonathan previously served in various roles for Legacy EJY, Inc. (formerly known as Enjoy Technology, Inc.), an operator of mobile retail stores that went public in 2021, including as a member of the board of directors (from December 2020 to September 2022), Chief Administrative Officer (from December 2020 to September 2022), and Chief People Officer (from February 2021 to January 2022). On June 30, 2022, Enjoy filed voluntary petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. He also served in executive leadership roles at the Major League Baseball, including as Chief Investment Officer from January 2015 to May 2016 and as Executive Vice President and Chief Financial Officer from March 2002 to December 2014, and as Interim Head of Regional Sports Networks for The Walt Disney Company in 2019 prior to their sale to Sinclair Broadcasting. Prior to his position at the Major League Baseball, he was the Chief Financial Officer for the Florida Marlins Baseball Club, Florida Panthers Hockey Club and Dolphins Stadium. He has served as a board member of Five9, Inc. since May 2023 and OneStream, Inc. since July 2024, and various other private companies and organizations, including McGraw-Hill Education since 2016 and IEX Group, Inc. since 2016. He previously served as a board member of Tyson Foods, Inc., Ultimate Software Group Inc. and FM Global Insurance, Inc. Jonathan earned a Bachelor's degree from the University of Virginia and a Master's degree in Business Administration from the Harvard Business School. He was previously a certified public accountant.

Through his numerous executive roles and as a former CPA, Jonathan contributes to our Board with significant leadership experience in finance, investments, human capital, compliance, accounting and strategy. Further, through his experience at Enjoy Technology and as founder of a software company, he also has experience in technology, client development and user experience, and industry disruptive innovation. Jonathan's ongoing service as a director of other public company boards also provides critical knowledge on key oversight functions. Our Board has determined that he qualifies as an audit committee financial expert under SEC rules, providing the basis for his critical leadership as our Audit Committee Chair.

**Defendant Tellem**

39.     Defendant Tellem served as a Company director from August 2020 until June 2025. While on the Board, she was a member of the Audit Committee and the Compensation Committee.

40.     The 2021 Proxy Statement stated the following about Defendant Tellem:

Nancy Tellem is a member of our Board. Nancy is the Executive Chairperson of

14

Eko, a media network that reimagines storytelling by using proprietary technology to create interactive stories that respond and leverage the interactive nature of today's media devices. Nancy has held this role since 2014. Nancy holds board and advisory positions at numerous digital and media-related companies, including Eko, League Apps, Basblue, All City Network and Sipur Studios and is a board member of Cranbrook Art Academy and Museum, the Detroit Symphony Orchestra and the Detroit Riverfront Conservancy. Nancy also is a director of TKO Group Holdings, Inc., and previously served as a director of Gores Guggenheim, Inc., UTA Acquisition Corporation, Nielsen Holdings, Metro-Goldwyn-Mayer and Struum. Nancy previously has held executive positions at several leading entertainment companies, including Xbox Entertainment Studios, CBS, and Warner Brothers. Nancy earned a Bachelor's degree from University of California, Berkeley, and a J.D. degree from UC Hastings College of the Law.

Having served in numerous executive leadership roles at prominent digital, entertainment and media-related companies, Nancy contributes to our Board her significant experience in business strategy, game-changing innovation and technology, insights on culture and branding, as well as accounting and finance expertise. Nancy also has public company board experience, from which she contributes significant knowledge on key oversight functions. Our Board has determined that she qualifies as an audit committee financial expert under SEC rules.

## **Defendant RHI**

41.     Defendant RHI is a Detroit-based privately held entity. RHI's controlling shareholder is Rocket founder and Chairman, Defendant Daniel Gilbert. RHI is therefore controlled by Defendant Daniel Gilbert. As of March 31, Defendant RHI owned 1,847,777,661 shares of Rocket's Class D stock, representing 99% of all outstanding Class D shares. Each Class D share carried 10 votes, whereas each Class A share carried one vote. According to Rocket's certificate of incorporation, if RHI's voting power exceeded 79.0%, it would be capped at that level. Therefore, throughout the Relevant Period, Defendant RHI maintained voting control over 79% of Rocket's outstanding shares.

42.     On March 24, 2021, when the Company filed its Form 10-K for the 2020 Fiscal Year (the "FY20 10-K) with the SEC, Defendant's admitted that Defendant Daniel Gilbert controlled Rocket's business and operations through his stock ownership and executive

management: "We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders."

43.     There is also significant overlap between the management of Rocket and RHI. Defendant Daniel Gilbert serves as Chairman of both companies' board of directors; Defendants Jennifer Gilbert and Rizik serve as directors of both boards; and Defendant Rizik currently serves as the Treasurer, Chief Financial Officer ("CFO"), and Chief Tax Officer of RHI.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers, directors, and/or fiduciaries of Rocket and because of their ability to control the business and corporate affairs of Rocket, the Individual Defendants owed Rocket and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rocket in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Rocket and its shareholders so as to benefit all shareholders equally.

45.     Each director and officer of the Company owes to Rocket and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rocket, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.     To discharge their duties, the officers and directors of Rocket were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rocket, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Rocket's Board at all relevant times.

49.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50.     To discharge their duties, the officers and directors of Rocket were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Rocket were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Michigan, and the United States, and pursuant to Rocket's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Rocket conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Rocket and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rocket's operations would comply with all applicable laws and Rocket's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.     Each of the Individual Defendants further owed to Rocket and the shareholders the duty of loyalty requiring that each favor Rocket's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

52.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Rocket and were at all times acting within the course and scope of such agency.

53.     Because of their advisory, executive, managerial, directorial, and controlling positions with Rocket, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

54.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Rocket.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

55.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Rocket was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Rocket, and was at all times acting within the course

and scope of such agency.

## ROCKET'S CODE OF CONDUCT AND GOVERNANCE POLICIES

### *Code of Conduct*

60.     Rocket's Code of Conduct and Ethics (the "Code of Conduct"), effective December 22, 2020, states that "Rocket Companies, Inc. . . . and each of its subsidiaries . . . require the highest standard of professional and ethical conduct from its team members, officers, and directors."

61.     Under the heading "Introduction," the Code of Conduct states the following, in relevant part:

> The Company's reputation for honesty and integrity is key to the success of its business. The Company intends that its business practices will comply with the laws of all of the jurisdictions in which it operates and that honesty, integrity, and accountability will always characterize the Company's business activity. No team member, officer, or director may achieve results through violations of laws or regulations or unscrupulous dealings.

> This Code reflects the Company's commitment to this culture of honesty, integrity, and accountability and outlines the basic principles and policies with which all team members, officers, and directors are expected to comply. Therefore, we expect you to read this Code thoroughly and carefully.

> * * *

> Cooperation with this Code is essential to the continued success of the Company's business and the cultivation and maintenance of its reputation as a good corporate citizen. Misconduct is never justified, even where sanctioned or ordered by someone in a position of higher management. No one, regardless of stature or position, can authorize actions that are illegal, or that jeopardize or violate Company standards

> * * *

> Nothing in this Code prohibits you from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission (the "SEC"), Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. You do

21

not need any prior authorization to make any such reports or disclosures, and you are not required to notify the Company that you have made such reports or disclosures.

62.     Under the heading "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> The safest way to ensure you are not involved in a conflict of interest, or a perceived conflict, is to simply disclose the activity. Failure to promptly disclose information about any actual or potential conflict may affect your employment status at the Company.
>
> If you have an interest that may create a conflict:
>
> - Promptly inform your team leader
>
> - Include name of third party and description of the conflict

63.     Under the heading "Public Reporting," the Code of Conduct states the following, in relevant part:

> Full, fair, accurate, and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its shareholders
>
> Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:
>
> - all accounting records, and the reports produced from such records, must comply with all applicable laws;
>
> - all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;
>
> - all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;
>
> - accounting records must not contain any false or intentionally misleading entries;
>
> - no transactions should be intentionally misclassified as to accounts,

departments, or accounting periods;

- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;

- no information should be concealed from the internal auditors or the independent auditors; and

- compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

64.     Under the heading "Protection and Proper Use of Company Assets," the Code of

Conduct states the following, in relevant part:

All team members, officers, and directors should promote and ensure the efficient and responsible use of the Company's assets and resources by the Company. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incidents of fraud or theft should be immediately reported for investigation.

Company assets, such as proprietary information, funds, materials, supplies, products, equipment, software, facilities, and other assets owned or leased by the Company or that are otherwise in the Company's possession, may only be used for legitimate business purposes and must never be used for illegal purposes.

65.     Under the heading "Insider Trading, Hedging and Pledging," the Code of Conduct

states the following, in relevant part:

Insider trading is unethical and illegal. Team members, officers, and directors must not trade in securities of a company while in possession of material non-public information regarding that company. It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has an Insider Trading Policy, which describes these obligations in more detail and sets forth obligations in respect of trading in hedging and pledging the Company's securities.

66.     Under the heading "Compliance with Laws, Rules and Regulations," the Code of

Conduct states the following, in relevant part:

Compliance with all laws, rules, and regulations applicable to the Company is critical to our reputation and continued success. This includes compliance with Canadian, U.S. federal, state, and local laws and regulations applicable to, among

other things, the manner in which we conduct our loan origination and servicing businesses and the fees that we may charge, and the collection, use, retention, protection, disclosure, transfer, and other processing of personal information, as well as any securities exchange, the Consumer Financial Protection Bureau, state attorney general offices or other organization or body that regulates the Company. All team members, officers, and directors must respect and obey the laws of the cities, states, and countries in which the Company operates and avoid even the appearance of impropriety. Team members, officers, or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

### *Corporate Governance Guidelines*

67.    Under a subheading titled "Character," under the heading "Director Selection and

Board Membership Criteria," the Corporate Governance Guidelines state:

Directors should be persons of good character and thus should possess all of the following personal characteristics:

- *Integrity*: Directors should demonstrate high ethical standards and integrity in their personal and professional dealings;

- *Accountability*: Directors should be willing to be accountable for their decisions as directors;

- *Judgment*: Directors should possess the ability to provide wise and thoughtful counsel on a broad range of issues;

- *Responsibility*: *Directors* should interact with each other in a manner which encourages responsible, open, challenging and inspired discussion; and

- *High Performance Standards*: Directors should have a history of achievements which reflects high standards for themselves and others.

68.    Under a subheading titled "Directors' Duties," under the heading "Board Roles,

Procedures and Practices," the Corporate Governance Guidelines state, in relevant part:

The Board is elected by stockholders to provide oversight and strategic guidance to senior management. The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its stockholders. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the Company's officers, team members, outside advisors and independent auditors. The Board selects and oversees senior management, to whom the Board delegates the authority and responsibility for the conduct of the day-to-day operations of the business. The

Board will adopt a strategic planning process to establish objectives and goals for the Company and will review, approve and modify as appropriate the strategies proposed by senior management to achieve such objectives and goals. The Board will review and approve, as appropriate, a strategic plan that takes into account, among other things, the opportunities and risks of the Company's business and affairs

69.     Under a subheading in the same section titled "Code of Conduct and Ethics and Other Company Policies," the Corporate Governance Guidelines state:

The Company has adopted a Code of Conduct and Ethics and other internal policies and guidelines designed to support these guidelines and to comply with applicable law. The directors are expected to comply fully with that Code and any other applicable policies and guidelines. The Board will adopt and review, as appropriate, policies and procedures designed to ensure that the Company, its directors, officers and team members comply, in all material respects, with all applicable regulatory requirements and conduct the Company's business ethically and with honesty and integrity. Principal policies consist of:

(a)     Code of Conduct and Ethics;

(b)     Conflict of Interest Policy;

(c)     Guideposts;

(d)     Insider Trading Policy;

(e)     Related Person Transactions Policy;

(f)     Regulation FD/External Communications Policy;

(g)     Disclosure Controls and Procedures Policy;

(h)     Stock Ownership Guidelines; and

(i)     Clawback Policy.

70.     In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of

fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, violations of the

Exchange Act, and the aiding and abetting thereof. Moreover, one of the Individual Defendants

violated the Code of Conduct by engaging in insider trading. Also, in violation of the Code of

Conduct, the Individual Defendants failed to maintain internal controls and failed to comply with

laws and regulations, conduct business in an honest and ethical manner, and properly report

violations of the Codes of Conduct.

## ROCKET'S AUDIT COMMITTEE CHARTER

71.     The Company also maintains an Audit Committee Charter (the "Audit Committee

Charter"). According to the Audit Committee Charter, the Audit Committee's purpose is to

oversee:

(a)     the reliability and integrity of the Company's accounting policies, financial
        statements and other financial information provided by the Company to its
        shareholders, the public, any stock exchange and others;

(b)     the Company's compliance with legal and regulatory requirements;

(c)     the qualifications and independence of the Company's independent auditor;

(d)     the performance of the Company's internal audit function and
        its system of internal controls and independent auditor;

(e)     the Company's cybersecurity, information and technology security and data
        privacy strategies and policies; and

(f)     such other matters as are assigned to the Committee by the Board pursuant
        to this Charter or as mandated under applicable laws, rules and regulations
        (including the Securities Exchange Act of 1934 and the rules promulgated
        thereunder, as amended (the "Exchange Act")) as well as listing standards
        of the New York Stock Exchange (the "Exchange") (together, the
        "Applicable Requirements").

72.     The Audit Committee Charter, under the heading "Authority and

Responsibilities," states that:

In fulfilling its duties and responsibilities hereunder, the Committee will be entitled

to rely reasonably on (a) the integrity of those persons within the Company and the professionals and experts (such as the Company's independent auditor) from whom it receives information, (b) the accuracy of the financial and other information provided to the Committee by such persons and (c) representations made by the Company's independent auditor as to any services provided by such firm to the Company.

73.     Under the same heading, in the subsection titled "With respect to the Company's

financial statements and disclosure matters," the Audit Committee Charter states that the Audit

Committee shall, in relevant part:

> 10.     Review and discuss with management and the Company's independent auditor (a) major issues regarding, or significant changes in, the Company's accounting principles and financial statement presentations, including complex or unusual transactions and highly judgmental areas, and significant auditing and regulatory pronouncements, (b) analyses prepared by management or the Company's independent auditor concerning significant financial reporting issues and judgments made in connection with the preparation of the financial statements, (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company, including all material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons and (d) the type and presentation of information to be included in earnings press releases and any financial information and earnings guidance provided to analysts and rating agencies.
>
> * * *
>
> 14.     Review and discuss with management the Company's earnings press releases, including the use of non-GAAP financial measures and other "pro forma" or "adjusted" presentations, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), and each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.
>
> 15.     Review and discuss with management, including the Company's disclosure committee, enterprise risk management team, and the internal audit group the Company's major financial, compliance and operational risk exposures and management's risk assessment and risk management policies.

74.     Under the same heading, in the subsection titled "With respect to the internal audit

function and internal controls," the Audit Committee Charter states that the Audit Committee shall,

in relevant part:

20.    In consultation with the Company's management, independent auditor and the internal audit group, review the adequacy of the Company's internal control over financial reporting, disclosure processes and its procedures designed to ensure compliance with laws and regulations, and any special audit steps adopted in light of material control deficiencies.

* * *

23.    Review with management any management letters attesting to information supporting the audit and the steps management intends to take to address the issues raised by those letters.

75.    Under the same heading, in the subsection titled "With respect to the Company's compliance programs," the Audit Committee Charter states that the Audit Committee shall, in relevant part:

24.    Monitor compliance with the Company's Code of Conduct and Ethics, and oversee, review and discuss with management, at least annually, the implementation and effectiveness of the Company's compliance and ethics programs. Review and take appropriate action with respect to any reports to the Committee from legal counsel for the Company concerning any material violation of law or Company policies or breach of fiduciary duty or similar violation by the Company, its subsidiaries or any person acting on their behalf. As appropriate, the Committee shall report and make recommendations to the Board with respect to these matters.

25.    Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of the Company or any subsidiary or affiliate of the Company whose financial information is included in the Company's financial statements of concerns regarding questionable accounting or auditing matters.

26.    Review and approve (a) any amendment to or waiver from the Company's Code of Conduct and Ethics for the chief executive officer and senior officers and (b) any public disclosure made regarding such change or waiver and advise the Board with respect to the Company's policies and procedures regarding compliance with the Company's Code of Conduct and Ethics.

76.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and

misleading statements to the public and to facilitate and disguise the Individual Defendants'
violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control,
waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit
Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's
records and reports, comply with laws and regulations, act in good faith and diligence without
misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit
Committee Charter.

## SUBSTANTIVE ALLEGATIONS

### Background

77.     Rocket is a financial technology company headquartered in Detroit, Michigan with
operations consisting of mortgage, real estate, and personal finance. Defendant Daniel Gilbert
founded the Company in 1985 to serve as a "brick-and-mortar company." In 1999, the Company
shifted from a traditional mortgage lender model when it launched RockLoans.com, a branch-
based lender site intended to function as an online personal loan business with a focus on high
quality, prime borrowers to create a user-friendly platform dedicated to the client experience. The
success of the site transformed Rocket into a leader in the lending industry and opened the door
for the Company to expand its services.

78.     In 2015, Rocket launched its "flagship business[,]" Rocket Mortgages. Rocket
Mortgages purports to provide a simple and convenient way to get a mortgage by utilizing a digital
solution with automated data retrieval and advanced underwriting technology to deliver fast
solutions to any client.  The Company's Form 10-K it filed with the SEC on March 24, 2021 (the
"FY21 10-K") states that Rocket Mortgages allows "[o]ur clients to leverage the Rocket Mortgage
app to apply for mortgages, interact with our team members, upload documents, e-sign documents,

receive statements, and complete monthly payments."

79.     In 2017, Rocket became the world's largest residential mortgage lender, surpassing close to 30,000 lending institutions. By the end of the first quarter of 2020, the Company's market share grew to 9.2% of the over $2 trillion annual market. This solidified the Company as the largest home mortgage loan originator in the United States.

80.     Rocket launched its initial public offering ("IPO") in August 2020. Through its IPO, the Company raised $1.8 billion, selling 100 million shares for $18.00 per share.

81.     The Company's primary business model is to originate mortgage loans and then sell those loans in the secondary market as a premium. The graph below reflects that the Company's net revenue from the sale of loans in the secondary market—the "gain on sale of loans, net,"—made up more than 85% of Rocket's total revenue between 2017 and 2021:



82.     The "gain on sale of loans, net" metric became highly material to Rocket as a key performance indicator for the Company's business. The FY21 10-K bolstered this sentiment, stating that the Company's "mortgage origination business *primarily generates revenue and cash*

***flow from the gain on sale of loans, net***. The gain on sale of loans, net includes all components related to the origination and sale of mortgage loans[.]"[1]

83.     The "Gain on Sale margin" is also used by the Company as a measure of profitability for its mortgage business. In the Company's July 28, 2020 Form S-1 Registration Statement ("Registration Statement"), Rocket explains that the metric "measures the gain on sale revenue generation of our combined mortgage business."

84.     Rocket categorizes its loans in one of two ways: (1) home purchase loans (i.e., loans extended to clients to purchase a new home), and (2) home refinance loans (i.e., loans extended to clients for the purpose of paying off an existing loan and refinancing the underlying property). As detailed in the Second Amended Complaint for the Securities Class Action, captioned *Shupe v. Rocket Companies, Inc. et al* (the "Second Amended Complaint"), the Company's largest volume of loan originations are refinance loans, as seen below:



---

[1] Unless otherwise indicated, all emphasis is added.

85.     Almost all loans originated by the Company are then sold into the secondary market, typically to GSEs such as Fannie Mae and Freddie Mac. The loans purchased from Rocket by these GSEs are then collected together, packaged, and sold to the secondary market as mortgage-backed securities ("MBS"). The relationship between the MBS price and interest paid, known as the MBS "Yield," closely correlates to the historical 10-year Treasury yield, as demonstrated in the graph below:



86.     Rocket's business is structured in two primary segments: (1) the Direct-to-Consumer segment ("DTC"), which includes consumers contacting Rocket directly through its website or mobile app for mortgage loans, and (2) the Partner Network segment, which consists of loans provided through referrals from mortgage brokers or third parties. The DTC segment is known to the Company as the "Retail" business, whereas the Partner Network segment is known as the "Wholesale" or the "Broker" business.

87.     The DTC segment typically generates higher Gain on Sale margins than the Partner Network, as the loans originating from that segment arise out of direct contact with the consumer; pursuant to the foregoing, the Company fully retains the profits, rather than sharing profits with a third party referring loans to the Company like in the Partner Network. As demonstrated in the graph from the Company's public filings, from 2018 to 2021, the DTC segment had much higher Gain on Sale margins:



88.     Around the same time frame, the DTC segment also originated a higher volume of closed loans. The closed loan volume refers to the unpaid dollar amount of Company-issued loans. In the first quarter of 2019, shown below, the DTC segment originated $15.4 billion worth of closed loan volume, more than double the amount originated by the Partner Network:



89.     The DTC segment has generated the majority of Rocket's revenues due to its continued account for greater volumes of loans at higher Gain on Sales margins, as shown in the graph below:



90.     While the Partner Network generates less revenue, the Company continues to originate loans through the segment because Rocket has the opportunity to then cross-sell

mortgage refinance, personal loans, and auto loans to existing clients. The Partner Network is also valuable as the client acquisition costs are lower, and there are minimal incremental overhead costs involved.

### Rocket's Key Performance Indicators

91.     Rocket's Registration Statement, filed in connection with the Company's IPO and signed by Defendants Daniel Gilbert, Jennifer Gilbert, Farner, and Rizik, touted to investors that the Company's Key Performance Indicators ("KPIs")—including "Loan Production" KPIs— would be closely monitored by the Company. This statement was reaffirmed by Defendants in each subsequent quarterly and yearly filing, including filings made during the Relevant Period.

92.     The "Loan Production" KPIs include: (1) Gain on Sale margins, (2) Closed Loan Origination Volume, where the Company also monitors the DTC and Partner Network segments, and (3) Total Market Share. Since 2017, the Company has consistently tracked these three Loan Production KPIs on a quarterly and yearly basis.

93.     In the Registration Statement, the Company assured investors that it "monitor[s] a number of key performance indicators to evaluate the performance of our business operations." Specifically, as to the Loan Production KPIs, the Defendants stated that these KPIs "***enable us to monitor our ability to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market***." Therefore, it is evident these three Loan Production KPIs were intended to aid Rocket in understanding and predicting gain on sale revenue.

94.     As gains on sale revenue was an important benchmark to the Company, Defendants would have tracked the three Loan Production KPIs during the Relevant Period and at all relevant times.  Therefore, in 2020, when the third quarter and fourth quarter fiscal results became known to Defendants, it should have been clear to them that Gain on Sale margin was

steeply declining. This decline continued for three more fiscal quarters, leading into the Relevant Period, as shown below:

| Reported Quarter | Gain on Sale Margins | Closed Loan Volume for the Quarter | Closed Loan Volume: DTC | Closed Loan Volume: Partner |
|---|---|---|---|---|
| 4Q 2019 | 3.41% | $50.8 billion | $31.4 billion | $19.4 billion |
| 1Q 2020 | 3.25% | $51.7 billion | $31.7 billion | $20 billion |
| 2Q 2020 | 5.19% | $72.3 billion | $45.8 billion | $26.5 billion |
| 3Q 2020 | 4.52% | $89 billion | $54.6 billion | $34.4 billion |
| 4Q 2020 | 4.41% | $107.2 billion | $68.4 billion | $38.8 billion |
| 1Q 2021 | 3.74% | $103.5 billion | $61.4 billion | $42.1 billion |
| 2Q 2021 | 2.78% | $83.7 billion | $45.2 billion | $38.5 billion |

95.     Confidential Witnesses interviewed in the Securities Class Action ("CWs") also reiterated that the Company constantly tracked Loan Production KPIs.

96.     A former Associate Business Analyst of Rocket Loans/Quicken Loans from November 2019 to June 2021 and a Business Metrics Analyst from June 2021 to November 2021, who was interviewed in the Securities Class Action ("CW 1"), noted that the Company's management monitored Rocket's Gain on Sale margin "daily," if not "at least four times a week." CW 1 explained that Rocket's Senior VPs had access to a "dashboard" believed to be available to every manager Director-level and above, from Regional VPs to senior executives. The dashboard presented metrics, including the Gain on Sale margin, the "talk time" of the bankers with

prospective borrows, the allocation of clients to the banks, and the extent to which the banks were monitored. According to CW 1, the dashboard was used to examine the overall time it took for loans to close as well as to track closed loan volume and approved credit volume. The dashboard also categorized these metrics and statistics by business segment (i.e., retail and wholesale).

97.     Similarly, a former Rocket Strategy & Analytics Data Analyst intern from May 2021 to August 2021, who was interviewed in the Securities Class Action ("CW 2"), was responsible for designing a new dashboard with the purpose of providing a range of metrics to track the "life cycle" of a loan. According to CW 2, the dashboard developed tracked volume of activity and time to complete various steps. The dashboard operated as a visual platform for the Company's senior leadership and allowed them to evaluate the effects of promotions, where there may be bottlenecks impacting the completion of loan folders, and to decide banker placement in certain areas. While the dashboard CW 2 developed did not go live until the completion of his internship, he confirmed that he was working on a redesign of the existing dashboard, indicating that the metrics and data were already available to senior executives at all relevant times.

98.     In addition to tracking Loan Production KPIs, Defendants also tracked each step in the loan pipeline. Rocket drives potential clients to its website or mobile application to generate loans. If a potential client reaches Rocket's website or mobile app, they are prompted to provide information such as:

(1)  Type of Loan: Home Refinance, Home Purchase, or Cash-Out Refinance;

(2)  Home    Description:    Single-Family,    Multifamily,    Condominium,    or Townhouse;

(3)  Property Use: Primary Residence, Secondary Home, or Investment Property;

(4)  Expected Timelines: Signed a Purchase Agreement, Offer Pending, Found a House, Buying in 30 Days, Buying in 2 to 3 Months, Buying in 4 to 5 Months, Buying in 6+ Months, or Researching Options;

(5) First-time home buyer: Yes or No;

(6) Credit Profile: 720+, 660-719, 620-659, 580-619, or Below 580;

(7) Name: First and Last;

(8) Email Address; and

(9) Password to establish an account with Rocket.

99. After providing the above information, the potential client has created a Rocket Mortgage account and may start a loan application online. As such, Rocket collects data about a potential client and characteristics about a potential loan before the loan application even begins. Rocket's online mortgage application prompts potential clients to provide much of the same information.

100. Throughout the Relevant Period and at all relevant times prior, the Company tracked and analyzed internet traffic to its website. As explained in the FY21 10-K, which was signed by each of the Individual Defendants, as well as other Company SEC filings:

> We monitor a number of key performance indicators to evaluate the performance of our business operations. Our loan production key performance indicators enable us to monitor our ability to generate gain on sale revenue as well as understand how our performance compares to the total mortgage origination market. . . . ***We also include Rockethomes.com average unique monthly visits, as we believe traffic on the site is an indicator of consumer interest***.

101. Further, the Company's subsidiary "Core Digital Media," an online marketing and client acquisition platform, tracked and analyzed consumer interests to predict the likely volume of new loans. As explained in Rocket's Registration Statement:

> Core Digital Media is an online marketing and lead generation service provider in the mortgage, insurance and education sectors. ***Core Digital Media is a generator, buyer and seller of leads for third parties and for Rocket Mortgage***. Core Digital Media owns and operates several marketing platforms, including "LowerMyBills.com," that connect clients with providers of home loans, auto loans, personal loans, and auto, life and home insurance. Acquired in 2017, ***Core***

38

*Digital Media has become an important component of our performance marketing strategy*. Core Digital Media enables growth for our broader ecosystem by *offering unique insight into the lead generation market* and allows us to introduce innovative marketing programs designed to increase the conversion rates for online leads.

Core Digital Media generated over six million client leads for mortgage and other industries in 2019. *Core Digital Media's unique ability to consistently generate high quality leads*, coupled with Rocket Mortgage's superior client experience, *has driven higher conversion rates and has aided our market share growth in Rocket Mortgage*. We also leverage Core Digital Media's capabilities in cross-marketing our products and services to clients across our ecosystem.

102.    Therefore, through Core Digital Media generated leads, as well as data gathered on potential clients before an application was submitted, the Company had access to numerous information channels to synthesize data regarding potential loan volume and predict closed loan volume. During the Relevant Period, the Company boasted its ability to use proprietary machine learning software to parse through its vast "data lake" of information to anticipate market conditions and predict future loans in "real time." For example, during the Company's fourth quarter 2020 earnings call on February 25, 2021, Defendant Farner stated:

Along with our powerful Rocket Cloud Force, our company also continues to rapidly grow its use of ethical, artificial intelligence and machine learning to streamline the business. This acceleration is made possible, thanks to *our vast data lake, which includes proprietary first-party data on more than 58 million consumers and extends to 220 million consumers in total or 85% of the adults in the United States*. We have the benefit of millions of clients working with us each year to buy a car, get a personal loan, buy a home or refinance a mortgage, and *we've been able to leverage this information to build sophisticated models* to ensure our brand is in front of our clients and top of mind when they're ready to transact. In fact, since the beginning of 2019, *data science has driven more than $75 billion in application volume. The importance of data cannot be overstated. It is this information that allows us to quickly innovate, anticipate the market and, in some cases, develop new companies all together. These real-time insights are a significant market advantage and consistently guide us to the right decisions* with incredible efficiency. Together, these pillars of our business: our scalable platform, our national brand, our Rocket Cloud Force and our strategic use of data, combine to create a technology powerhouse that continues to accelerate at scale.

103.    Also, the Company's fourth quarter of 2020 press release stated:

The Rocket Companies platform generated 153 million unique visitors in 2020, a 61% increase from 2019. Our vast data lake includes proprietary first-party data on more than 58 million consumers and extends to 220 million consumers in total or 85% of the population of adults in the United States. [] Using our data science capabilities and leveraging our data lake, we recently crossed an important milestone, generating more than $75 billion in application volume over the past two years.

104.     Similarly, the Company's Registration Statement also touted Rocket's ability to

forecast future transactions in the loan process, stating:

**Data Analytics**

We have access to client financial information and needs which allows us to more effectively understand and market to our clients. ***Both through lead acquisition and servicing, we aggregate this information on*** current and ***potential clients***. For example, knowing the details of a client's existing mortgage ***allows us to execute a real-time marketing campaign to targeted clients when mortgage rates drop***. ***We also have the ability to predict*** . . . ***when a family may be looking to buy a new home and will potentially need a purchase mortgage***.

The scale and design of ***our model allows us to gather insights into and improve the client experience through measuring and recording each step in the process***. ***We track, test and refine every step of the client journey*** and our users' experience. ***This allows us to intelligently manage our funnel of potential clients, drive conversion*** and continuously identify areas of potential improvement. Our scale has enabled us to experiment with various approaches to these tasks and constantly tune our strategies for user satisfaction.

105.     The Registration Statement also explained that Rocket prioritizes each step on the

loan process by analyzing data gathered through proprietary technology. Defendants also stated

the following during the May 2021 Earnings Call for the first quarter of 2021:

As we develop industry-leading technologies that create better outcomes for our clients, we are also continuing to improve and evolve how we leverage the tremendous insights we can glean from our centralized integrated data lake. ***This data lake and its 220 million consumer records is a strategic moat for the Rocket platform***. Leveraging this resource in the first quarter, we significantly expanded our data marketplace, an internal API platform that allows our teams to develop new applications, run marketing campaigns and even build new business lines, ***all using common, trusted and secured data assets. Machine learning and AI continue to play an increasingly important role in our organization as well. Every single day***, our systems make nearly 8.5 million automated decisions, helping to

ensure we are running the business.

106.     On the same call, Defendant Farner touted the purported predictive capability of

Rocket's models, stating:

> *I think we're very well positioned and this goes back to our data science team.*
> *We have 220 million records. We talk to millions of people a month*,
> understanding their debt load. *We can model out where they were a year ago and*
> *then also model out where they will be in the future*, creating all kinds of
> opportunity to balance out the equity in their home, with the debt that they're
> building and we can consolidate that. *That's a huge piece of our business*. *We've*
> *been executing on that for years.*

107.     Defendant Farner alluded to the Company's ability to forecast key metrics about

the business due to information retrieved from the Company's massive database. Rocket's own

admissions in its Registration Statement support this: "Our crediting decisions and scoring models

are based on algorithms that evaluate a number of factors, including behavior data, transactional

data, and employment information." Such models allow the Company to predict the likelihood of

closed loan status.

108.     Rocket has touted its technological infrastructure to investors to demonstrate its

capabilities to "stay ahead of regulatory changes." The Company has also touted its ability to track

loan applications from their inception, online traffic, and mobile app sign-ins, stating:

> We have thoughtfully developed our technology infrastructure in modules to enable
> agile enhancements and ensure flexibility to deploy this technology to a variety of
> partners. *Our infrastructure allows us to act swiftly and stay ahead of regulatory*
> *changes* and more quickly introduce new products and services, without the need
> for expensive overhauls or disruptive interventions. *With advanced analytics tools,*
> *we are often able to foresee potential issues before they arise*, further supporting
> uninterrupted client experience, business growth and operational efficiency.

> Our software is designed with scalability in mind to manage a large quantity of
> loans. On average, we currently process more than *6,200 client applications each*
> *day, and over 8,100 applications are started each day via our website, mobile app*
> *and mobile web. A sign-in to Rocket Mortgage occurs every half second from*
> *clients who are applying for a mortgage, have a mortgage in process, or accessing*
> *their loan servicing. Every 26 seconds a mortgage application is completed and*

*ready for underwriting.* The versatility and scalability of our technology provide a solid foundation for our continued growth.

109.     Thus, Rocket closely tracked these data points to predict and estimate loan volume. A former Senior Product Manager at Rocket from May 2020 to May 2021 interviewed in the Securities Class Action, who was responsible for aspects of the Company's website user interface ("CW 3"), confirmed that Rocket was able to forecast future loan activity based on website traffic. According to CW 3, the Company's "predictive analysis" began early in the loan application process and continued to incorporate both proprietary and publicly available data throughout. CW 3 also explained that Rocket could reliably predict which loans were likely to close and which were not, with the accuracy of these predictions improving as more information became available over time. In particular, Gain on Sales margin and closed loan volume could be projected based on the types of leads, inputs, and data the Company received.

110.     Indeed, Rocket's Registration Statement admitted that the Company "continuously monitored in-progress loans to leverage [its] proprietary, data-driven, decision engine to recommend the most efficient task."

111.     CW 1 stated that he met multiple times a week with the Company's Senior Vice Presidents to discuss the various milestones that occurred up until the close on a loan. According to CW 1, the Company tracked how any prospective borrowers met these various milestones towards a loan closing.

112.     A former Account Executive at Rocket's Wholesale" (Partner Network) side of the business who was interviewed in the Securities Class Action ("CW 4") noted that they were responsible for developing relationships with broker partners, providing training, and promoting the use of Rocket's platform. CW 4 confirmed that every phase of the loan approval process was monitored, including the application, registration, and subsequent status updates, and noted that

"top people" at the Company had access to this information.

113.    On the Company's website, it states that it takes about 45 to 60 days for a loan to close after an application is submitted. The website further indicates that the "standard mortgage loans take an average of 49 days, while FHA loans, with the longest average time, take 54 days, according to Ellie Mae."

114.    Accordingly, given the amount of proprietary data and information retrieved from the Company's "data lake," Defendants knew or should have known by approximately 45-60 days from the time of an initial loan application how many loans were likely to close in the future and how they would manifest in Rocket's financial results. Moreover, during Rocket's February 25, 2021 earnings call for the fourth quarter of 2020, Defendant Farner admitted that Rocket's capital market employees monitored the loan generation timeline "every day," to make informed decisions about hedging and utilize pre-application information as indicators for gain on sale and closed loan volume forecasts:

> **Q** (JPMorgan & Chase Analyst): ***When we look at the guidance on gain on sale for the first quarter***, how should we think about that in context of -- primary, secondary spreads have come in pretty significantly. But also, and this is the, I think, the more interesting nuance point, how are you thinking about your pipeline hedge and potentially an [inverse] a decrease in fallout with the [splicing rates]?
>
> A (Defendant Jay Farner): Yes. Great question. I can tell you that those type of things are what our capital markets folks are looking at every day and the data that we have, ***and I'm going to go back to the importance of the data from the top of the funnel, even pre-application to understand pull-through rates. And so those type of data points are priced in to the guidance that Julie's provided.***

### New Loan Applications and Closed Loan Volume Begins to Decline

115.    Starting in November 2020, the number of client inquiries generated by Core Digital Media declined. This reduction alerted Defendants to the likelihood of fewer loan applications in the fourth quarter of 2020, which in turn signaled a decrease in closed loans during

both the fourth quarter of 2020 and the first quarter of 2021.

116.    By the latter half of 2020, Rocket's net rate lock volume, a key metric for projecting future closed loans, had plateaued, and by the first quarter of 2021, it began to decline. As outlined in the Company's Registration Statement, the Company enters "agreements to lend to a client as long as there is no violation of any condition established in the contract," which are known as interest rate locks ("IRLCs"). The net rate lock volume reflects the unpaid principal balance of all loans under IRLCs, adjusted by a "pull-through factor," which estimates the percentage of IRLCs expected to close. In the third and fourth quarters of 2020, net rate lock volume became stagnant and then declined throughout the first half of 2021:



117.    Net rate lock growth, on the other hand, had been in decline since the second quarter of 2020. Indeed, quarter-over-quarter growth for net rate locks declined from 64% to 3% in the third quarter of 2020, then decreased to 1% in the fourth quarter of 2020:



118.     As client interest declined and net rate lock volume became stagnant in the second half of 2020, Defendants knew or should have known that the Company's closed loan volume would continue to decrease for the remainder of 2020 and into the first quarter of 2021.

***Interest Rate Increases Further Reduced the Company's Closed Loan Volume***

119.     As part of the Company's business model, Rocket issued loans for refinancing as well as for new purchases. From December 2020 to March 2021, approximately 90% of Rocket's originated loans were refinancing transactions. This is notable because refinancing activity is particularly sensitive to interest rate fluctuations.

120.     Homeowners typically refinance when interest rates fall in order to secure lower borrowing costs. In contrast, when interest rates rise, refinancing activity generally declines. The Company's primary source of mortgage originations was in the refinancing sector. Refinancing accounted for about 90% of Rocket's originated loans from December 2020 and March 2021; however, this was reduced to 79% in May 2021, as interest rates increased and consumer demand decreased:



121.     Moreover, rising interest rates negatively affect mortgage originators like Rocket by compressing the primary-secondary spread, or the gap between the interest rates offered to borrowers and the returns on mortgage-backed securities. This spread plays a critical role in determining how much GSEs are willing to pay for originated loans. Defendants acknowledged this dynamic during the May 5, 2021 Earnings Call, when the Company lowered its guidance on Gain on Sale margins for the first quarter of 2021:

If we look at that quarter-over-quarter change in the gain on sale margin guidance, it's really being driven kind of roughly by three *equal* factors: first of all, is changes in loan pricing and particularly our investment to drive the growth in the partner network channel; the ***second thing is that we did see the primary-secondary spread compress at the end of Q1 and into Q2***; and then the third factor that I'll mention is the channel and the product mix.

122.     Further, in the Company's FY20 10-K, Rocket expressed the significance of

interest rates and their potential impact on the Company's business:

Our financial performance is ***directly affected*** by changes in prevailing interest rates. . . . ***We generally note that the refinance market experiences more significant fluctuations than the purchase market as a result of interest rate changes.*** Long-term residential mortgage interest rates have been at or near record lows for an extended period, but they may increase in the future. As ***interest rates rise, refinancing generally becomes a smaller portion of the market as fewer consumers are interest in refinancing their mortgages. . . . Higher interest rates may also reduce demand . . . increase or maintain our volume of mortgages. Decreases in interest rates can also adversely affect our financial condition, the value of our MSR portfolio and the results of operations.*** With sustained low interest rates, as we have been experiencing, refinancing transactions decline over time, as many clients and potential clients have already taken advantage of the low interest rates. . . . Borrowings under our financing facilities are at variable rates of interest, which also expose us to interest rate risk. If interest rates increase, our debt service obligations on certain of our variable-rate indebtedness will also increase.

123.     In addition, interest rates were rising for both the 30-year and 15-year fixed rate

mortgage starting in early February 2021:



124.    At the same time, the U.S. 10-Year Treasury interest was also increasing:



125.     There is a historical correlation between mortgage rates and the U.S. 10-Year Treasury Yield. Indeed, an increase in mortgage rates tends to compress the primary-secondary spread, thereby diminishing the profitability of mortgage originators. Therefore, a rising 10-year rate can signal potential declines in future earnings.

### *The United Wholesale Ultimatum Further Reduced Volume of New Loan Applications*

126.     In the first quarter of 2021, interest rates began to rise, and Rocket's competitors began cutting their rates in order to increase loan volume and market share. To stay competitive, Rocket followed in suit. However, on March 4, 2021, United Wholesale Mortgage ("UWM"), a primary competitor of Rocket in the mortgage loan origination industry, issued an ultimatum against mortgage brokers. The ultimatum threatened large fees against brokers who continued to work with Rocket, forcing brokers to choose between the two competitors.

127.     In response to the ultimatum, Rocket lowered prices and engaged in a "discounting" program of Wholesale loans. A former National Account Executive at Rocket Companies/Rocket Pro TPO (*i.e.*, Wholesale) who was interviewed in the Securities Class Action ("CW 5") stated that he called clients after the ultimatum was issued to try and keep mortgage brokers with Rocket. However, these brokers were very loyal to UWM, so Rocket attempted to retain mortgage brokers through aggressive pricing and faster turnarounds for closing. According to CW 5, Rocket's special discount pricing became available to any broker who asked for it.

128.     CW 4 stated that Rocket was negatively impacted by the ultimatum, for within a month after the ultimatum was issued, he went from generating 30 to 35 new loans per month to generating only 5 per month. Moreover, despite efforts by Rocket to retain the business of brokers, Rocket's market share of loan volume originating with brokers fell from 23.39% in February 2021 to just 18.69% in May 2021.

**False and Misleading Statements**

*February 25, 2021 Earnings Call*

129.     On February 25, 2021, the Company held an earnings call with analysts and investors to discuss its financial results for the fourth quarter of 2020 and report its guidance for the first quarter of 2021 (the "4Q20 Earnings Call"). During the 4Q20 Earnings Call, an analyst from Goldman Sachs inquired about the Company's "competitive dynamics" brought along with changing rates, specifically within Rocket's primary business segments. In response, Defendant Farner took the opportunity to assure investors that the Company's business would not be impacted by rising interest rates, stating:

> Q: <u>Goldman Sachs</u>: Got it. And maybe I can ask a follow up to an earlier question. Jay, can you maybe just talk about some of the competitive dynamics you're seeing, given the changing rate backdrop and I was hoping you can maybe talk about it in the context of the Direct-to-Consumer and the Partner segments. I think there was a competitor in the Partner segment talking about exiting parts of the market. So I was hoping you can maybe talk about how that's evolving. And if we do continue to see rates going up, like, where do you inevitably see margins getting to over time? Thanks.
>
> A: Jay Farner: ***And so, usually, as we see these interest rates tick up a bit,*** what we're going to see is an opportunity for us to lean in to spend more money and now to talk about the retail or Direct-to-Consumer space, same situation here. There are so many marketing opportunities out there for us. And as others tend to step away or back away from the space, this is where we can lean in, we can grab market share. And not only are we thinking about the profitability that we achieved on the first transaction, we're thinking about the lifetime value of that client and we're now thinking about the lifetime value not only over mortgage, but real estate, auto, and these additional businesses that we'll be adding. So, I guess you can tell we're pretty excited about it and ***don't see interest rates going up or down, really having an impact on our business one way or the other.***

130.     Analysts responded positively to these purported developments, as evidenced, for example, by a February 28, 2021 news article titled *News Flash: Analysts Just Made A Meaningful Upgrade to Their Rocket Companies, Inc. (NYSE:RKT) Forecasts*, which stated that "[t]he analysts have sharply increased their revenue numbers, with a view that Rocket Companies will make

substantially more sales than they'd previously expected."

131.     Also in response to the 4Q20 Earnings Call, Barclays and RBC Capital published analyst reports noting that they expected Rocket's full year Gain on Sale margin to be 3.7% and 3.92%, respectively.

132.     Further, as a result of the false and misleading statements made by Defendants that day, the Company's stock jumped $8.1 per share, or approximately 29%, from a closing price of $19.90 per share on February 25, 2021 to close at $28.01 per share on March 3, 2021.

**March 3, 2021 Morgan Stanley Virtual TMT Conference**

133.     On March 3, 2021, Morgan Stanley hosted a virtual TMT Conference (the "TMT Conference"). At the TMT Conference, Defendant Farner was interviewed by a Morgan Stanley analyst about Rocket's business channel growth rate. The analyst asked the following, in relevant part:

> You talked about kind of your partner channel as direct. There's different types of direct, whether they're engaging with Rocket or they're doing everything electronically just with a phone and kind of what you're imagining and envisioning ultimately getting to. Can you talk a little bit about what portion each of those types of channels or processes are of the overall volume and business today? What their relative growth rates are? And how -- what you think that looks like in the very long run?

134.     In response, despite internal data indicating that the DTC volume was declining, Defendant Farner misrepresented that all business segments were growing, stating, in relevant part:

> So I know we don't break down the percentages, and I'm probably not going to go any further than what we've already laid out in our earnings call, but as you can ***probably sense from my passion***, ***they're all growing.*** And with what about less than 10% market share, wherever we are, it's hard to say today. If you think about all those different channels that can grow and give us reach, that's why we get excited about what this company looks like in the years to come.

51

135.    Defendant Farner's statements were false and misleading because the loan volume in each of the Company's channels had, in reality, declined for months, after a peak in November 2020 as depicted below:



136.    Further, the total closed loan volume started to decline after a November 2020 peak of $40.25 billion, to drop to just $32.44 billion in December 2020 and later to $22.38 billion by May 2021, as depicted below:



137.    Defendant Farner's statements above that all of the Company's segments were "growing" were also materially false and misleading because they: (1) failed to disclose that the Company's closed mortgage volume had experienced a substantial decline from its peak in November 2020; and (2) provided investors with the false suggestion that growth would continue in the near future, when, in reality, all pertinent metrics suggested a decline in (a) refinancing loan volume due to the present increased interest rate environment, (b) closed loan volume due to less loan applications being completed, and (c) a Gain on Sale margin decrease.

***March 11, 2021 Fox Business Interview***

138.    On March 11, 2021, Fox Business aired an interview with Defendant Farner where he was asked how the waning effects of the pandemic would impact the Company. In relevant part, the interview went as follows:

> Fox Business Representative: The pandemic is, I think, winding down. I'm not going to say it's over, but the effects of it are certainly winding down. Do you think that's good for Rocket Companies?

Defendant Farner: "I do. You know, we're going to see interest rates tick up a little bit here, we're all aware of that, but over the 35 years that we've been in business we take that as an opportunity to grow. Our focus on our platform and our tech platform really allows us to be very efficient when we're underwriting, processing, and closing mortgages. And so as other people pull back and capacity shrinks in the mortgage industry, it gives us a great opportunity to grow market share. And now, as we grow market share, not only are we capturing revenue with our mortgage, but title, real estate, auto, personal loans. So as we grow out all of those different services we're able to offer our clients that lifetime value of a client grows and grows for us. So, ***really, interest rates moving around are a great benefit to us.*** And then, of course, when they drop back down, we've got a 90% retention rate on our servicing book; we'll help those clients refinance their mortgage and save money. So, you know, cycles are good, at least for our business in the mortgage industry, and I think that's what we're going to see here this year."

***May 19, 2021 Twitter Post***

139.    On March 19, 2021, via a Twitter post and a retweet, Defendants Daniel Gilbert and Farner boasted about the Company's increased market share and volume from third-party loan originators, stating:



140.    These statements were materially false and misleading because they failed to disclose that: (1) Rocket was highly vulnerable to rising interest rates due to the inverse relationship between interest rates and refinancing volume, as well as the negative impact of higher rates on the Gain on Sale margin and the compression of the primary-secondary spread, all of which reduced the Company's profitability; (2) at the time of the Twitter post, Rocket had already

lost a significant portion of business as a result of the ultimatum issued by UWM; (3) in response

to the UWM ultimatum, Rocket began offering special discounts during the first quarter of 2021;

and (4) Rocket's market share in the broker channel declined immediately after the ultimatum was

issued, as depicted below:



141.    During the Relevant Period, closed loan volume was decreasing overall, including

in both the Broker and Retail channels:





142.   The statements in ¶¶129, 133, 134, and 138-139 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) during the Relevant Period, Rocket's

business remained heavily reliant on refinancing as its primary source of closed loan volume, making the Company particularly dependent on continued refinancing activity; (2) Rocket was especially sensitive to fluctuations in interest rates because: (i) refinancing volume significantly declines as interest rates rise; (ii) lower refinancing volume directly results in reduced revenue; (iii) higher interest rates diminish Rocket's profitability and Gain on Sale margin; (iv) rising rates compress the primary-secondary spread, further reducing profit margins; and (v) Rocket had acknowledged that its financial performance is "directly affected by changes in prevailing interest rates"; and (3) maintaining strong loan volume would require targeting clients less sensitive to interest rates, and that compression in the primary-secondary spread was already negatively affecting its profitability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

143.     The truth emerged on May 5, 2021 when the Company issued the 1Q21 Press Release, revealing its financial outcomes for the first quarter of the 2021 Fiscal Year (the "1Q21 Press Release"). The 1Q21 Press Release reported that Rocket was substantially revising its second quarter 2021 guidance for Gain on Sale margin and closed loan volume downward.

144.     In the 1Q21 Press Release, the Defendants represented that the second quarter 2021 guidance included an outlook for closed loan volume between $82.5 billion and $87.5 billion and Gain on Sale margin of 2.65% to 2.95%. For the midpoint of the guidance range, the 1Q21 Press Release represented a material decrease of $18.5 billion from Rocket's first quarter actual closed loan volume and a 239 basis point decline year-over-year of Gain on Sale margin, the Company's lowest post-IPO quarter Gain on Sale margin ever reported.

145.     That same day, Defendants held an earnings call with analysts and investors where

they reaffirmed the Company's financial results for the first quarter of the 2021 Fiscal Year as reported in the 1Q21 Press Release (the "1Q21 Earnings Call"). During the 1Q21 Earnings Call, Defendants outlined the Gain on Sale margins for each business segment, stating that DTC margins would drop to around 4% and the Partner Network margins to about 1%. With respect to the margins, the Company noted they were "moving back to more historical averages" and were "roughly consistent with historical levels prior to 2020." Thus, Defendants revealed on the 1Q21 Earnings Call that, while they had boasted throughout the Relevant Period about the increase in purchase application volume, the reality was that it had actually decreased due to a prior undisclosed shift in product mix to the lower margin of the Partner Network segment. In relevant part, Defendants revealed:

> Our combined second quarter gain on sale margin guidance of between 2.65% and 2.95% **reflects changes in channel and product mix, including continued strong growth in our partner network**, which drives attractive incremental profits.

146.    On the 1Q21 Earnings Call, Defendants also revealed that the Company would have to rely on new home purchases less sensitive to interest rate increases for Rocket to continue growing, effectively admitting that Rocket's business was negatively impacted by high interest rates:

> **In our mortgage business, continuing to drive strong volume in 2021 will require addressing client needs that are less sensitive to interest rates.**
>
> Turning to the home buying opportunity specifically, as you heard from Jay, home purchase transactions represent the single largest growth opportunity for Rocket Companies today. In the first half of 2021, we are seeing strong acceleration in purchase activity at Rocket Mortgage.

147.    Further, during the 1Q21 Earnings Call, the Company attributed its revised Gain on Sale margin guidance to the change in product mix in the Partner Network, the decline in loan pricing into the secondary market, and the primary secondary spread compression:

If we look at that quarter-over-quarter change in the gain on sale margin guidance, it's really being driven kind of roughly by three equal factors. First of all, is changes in loan pricing and particularly our investment to drive the growth in the partner network channel. The second thing is that we did see the primary secondary spread compress at the end of Q1 and into Q2. And then the third factor that I'll mention is the channel and the product mix.

148.    Later, in response to a question asked by a Goldman Sachs analyst, Defendant

Farner confirmed that the lower Gain on Sale margins could be attributed to the increase in volume

from broker transactions and shift in product mix to more broker-referred loans, stating:

> **Q:** <u>Goldman Sachs</u>**:** So I wanted to follow-up on a question that Arren asked on gain on sale margins. Do you foresee that we're at the bottom by channel? I know others have talked about industry underpricing loans. So can you maybe just talk about that combined with the competitive dynamics what's going on in the wholesale channel that's causing these competitive pressures? And Jay, how do you think about long term customer lifetime value versus trading off with some of the near term economics?

> **A:** Jay Farner**:** Maybe I'll start with the margin piece and Julie you can jump in here, too. But, look, we're kind of back to some of the historical longer term margins that we've experienced, which on our platform are still very profitable, number one, in the first transaction. But again, to some of the other comments that I made, it's also the additional or the lifetime value. ***Now, there's been some changes in particular in the broker market that I think are very interesting***. Our focus here is to solve the problem of our client. If a client needs to buy a house, how can we develop technology and service to assist them? If a broker wants to grow their business, how can we provide technology, marketing, et cetera, to assist them? Others have kind of focused on solving their own problems, I think, versus the brokers' problems. ***It's interesting what's happened because through that our partnership with the brokers that we got in that part of our partnership channel has strengthened. So the volumes that they're setting us are increasing.***

149.    On this news, the price of the Company's stock fell $3.79 per share, or

approximately 16.7%, from a closing price of $22.80 per share on May 5, 2021, to close at $19.01

per share on May 6, 2021. By May 11, 2021, the price of Class A common stock continued to

decline, closing at $16.48 per share.

### Defendants' Knowledge

150.    Throughout the Relevant Period, the Defendants had access to internal metrics

regarding the nature of the loan volume and gain on sale margin, such that they knew or recklessly disregarded the true extent of the misconduct, while at the same time making and/or causing the Company to make materially false and/or misleading statements regarding the same. Further, Defendant Gilbert and RHI had access to material non-public information regarding Company's declining performance such that they knew of the Company's plan to cut guidance, executed a stock sale, and violating the Company's Insider Trading Policy. Unfortunately, the Defendants placed their own interests over the interests of the Company and its shareholders.

### The Individual Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False When Made

151.    Defendants acknowledged in the Registration Statement, Rocket's 2020 and 2021 10-Ks, and all Form 10-Qs filed during the Relevant Period that management closely tracked key performance indicators to assess business performance, specifically identifying (1) Gain on Sale margin, (2) closed loan volume, and (3) market share as critical metrics. These filings, including the 1Q and 2Q 2021 Form 10-Qs, further stated that loan production KPIs help monitor Gain on Sale revenue and benchmark Rocket's performance against the broader mortgage origination market.

152.    Additionally, during the 1Q21 Earnings Call, Defendant Farner emphasized that Rocket's capital markets team reviewed the loan origination pipeline daily—tracking application pull-through rates to inform hedging strategies—and noted that this data was factored into the financial guidance.

153.    Rocket's use of data, performance metrics, and proprietary technology to track and prioritize loans in its sales pipeline gave management clear visibility into expected loan closings over the next 45–60 days. These tools alerted Defendants that closed loan volume, Gain on Sale margin, and market share were already in steady decline before and during the Class Period.

154.    Defendants' own admissions about closely monitoring loan origination data, along with Rocket's claims of accurately managing its potential client funnel and predicting client needs, support a strong inference that they were fully aware of declining Gain on Sale margins, shrinking primary-secondary spreads, and falling closed loan volume, and yet the Company continued to falsely assure investors that loan demand was rising and Rocket's business was unaffected by interest rate increases or market competition.

155.    Defendants also had the ability to review internal reports and data. However, their public statements directly contradicted the forecasts for loan volume and Gain on Sale margin.

156.    During the Relevant Period, the data dashboards displayed key internal metrics indicating a shift in Rocket's product mix toward the less profitable Partner Network segment, along with a decline in new loan applications. Additionally, Gain on Sale margin was monitored on a daily basis and accessible via these internal dashboards to all director-level employees and above, including senior executives such as the Defendants. These indicators signaled an impending drop in Gain on Sale margins and alerted Defendants that closed loan volume was experiencing a significant decline after its November 2020 peak.

157.    Further, as previously discussed, Defendants acknowledged that Rocket maintained a comprehensive "data lake" containing detailed loan characteristics, which, when analyzed through the Company's proprietary financial modeling tools, enabled accurate forecasting of loan volume and Gain on Sale margin by loan type and segment. Accordingly, Defendants knew or recklessly disregarded that their public statements regarding heightened or increasing demand, the UWM ultimatum, and the impact of rising interest rates were false at the time they were made.

158.    Defendants also discussed the declining loan volume and gain on sale margin at

internal company meetings. As detailed in the Second Amended Complaint, at Rocket's Board of Directors meeting on March 23, 2021, Defendant Farner presented a financial overview for March 2021, which reported a "March 2021 Revised Forecast" of:

- Expected decline in Gain on Sale Margin from 3.5% to 3.19%, a 9% decline from previous forecasts just a couple months ago.

- Expected declining 2021 revenue of $.95 billion, from $10.46 billion to $9.51 billion.

- Expected decline in refinance loan volume of 80% in 2021.

- Compression of primary/secondary spreads.

159.    Further, on March 10, 2021, Defendants Farner participated in an Audit Committee meeting discussing "certain business matters." He also attended another Audit Committee meeting on March 22, 2021, during which included reviewing reviewed Defendant Daniel Gilbert's March 19, 2021 Exchange Notice and his request to reopen the insider trading window to permit Defendant RHI to sell $500 million of Rocket Class A stock.

160.    The primary role of the Audit Committee was to review Rocket's quarterly earnings reports and SEC filings. Therefore, the "business matters" discussed at the meeting on March 10, 2021 likely included declining loan volume and a reduced Gain on Sale margin. This indicates that Defendants Farner and Daniel Gilbert were aware of Rocket's deteriorating financial performance based on the information presented in these Board and Audit Committee meetings.

161.    Because Defendants measured Rocket's core business of loan origination, Defendants were aware of the declining Gain on Sale margin and closed loan volume.

162.    In the FY21 10-K, Rocket stated that its "mortgage origination business primarily generates revenue and cash flow from the gain on sale of loans, net," which includes all components tied to the origination and sale of mortgage loans. In the 2021 Form 10-K, Rocket

further described Gain on Sale margin as a key profitability measure for its ongoing mortgage operations, reflecting revenue generation across its mortgage business.

163.    In 2021, gain on sale revenue totaled $8.84 billion—over 83% of Rocket's total net revenue. Closed loan origination volume was also identified as a critical performance indicator, essential for assessing Rocket's ability to generate gain on sale revenue. The Company acknowledged that lower origination volumes typically exert downward pressure on margins.

164.    As such, Gain on Sale margin and closed loan volume were Rocket's two most important financial metrics, directly tied to revenue in any given reporting period.

165.    Gain on Sale margin was consistently emphasized in earnings releases, Board meetings, and analyst calls, where it was a central focus along with closed loan volume. Analysts tracked both metrics closely, and Rocket typically reported them as the first two highlights in each quarterly earnings release.

166.    Given their significance to Rocket's financial performance, these metrics were critical to managing its core loan origination business, and Defendants not only monitored them closely but admitted to being aware of them at all relevant times.

### Defendants Daniel Gilbert and RHI Were Motivated to Engage in the Alleged Fraud to Profit from an Insider Sale Executed in Violation of the Company's Insider Trading Policy

167.    On March 29, 2021, Defendants RHI and Daniel Gilbert engaged in a substantial private sale of 20.2 million shares of Rocket stock at a price of $24.75 per share, yielding approximately $500 million in proceeds (the "Stock Sale"). Prior to this transaction, neither RHI nor Gilbert had publicly sold any shares of Rocket stock.

168.    This sale of RHI's interest in Rocket was both material and highly atypical for several reasons. First, the sale price significantly exceeded the market price of Rocket shares just

weeks later, closing nearly 33% higher than the stock's market price on May 5, 2021, shortly after corrective disclosures reached the market.

169.    Second, the Stock Sale directly contradicted public statements made by Defendant Farner on March 3, 2021, during the TMT Conference. In response to investor concerns, Defendant Farner assured the market that key insiders had not sold shares because they maintained strong confidence in Rocket's long-term prospects. Specifically, Farner stated:

> And as I've mentioned before, between myself and [Defendant Daniel Gilbert] and the other leaders in the organization, we own roughly 94%, 95% of the company. We believe in its future. And **we have not sold shares** -- or our key shares since we went public **because we believe strongly in the future of what we're building**.

170.    Next, the suspicious nature of the Stock Sale was further amplified by its unusual timing. On March 19, 2021, Defendants Daniel Gilbert and RHI submitted a notice of exchange ("Exchange Notice") seeking pre-clearance for the transaction. However, at that time, Rocket's insider trading window had already closed on March 12, 2021. As a result, in addition to the required pre-clearance, Defendants also had to obtain special authorization to temporarily reopen the trading window solely to permit this transaction to proceed.

171.    Under Rocket's Insider Trading Policy, the designated trading window for company insiders ordinarily opens "one business day after the public release of the Company's quarterly or annual financial results and ends on the date two weeks before the end of each fiscal quarter." Accordingly, for the first quarter of 2021, the insider trading window closed on March 17, 2021—two weeks prior to the quarter's end—and was not scheduled to reopen until after the next earnings release in May 2021.

172.    In order for Defendants RHI and Daniel Gilbert to convert their Holdings Units into Rocket shares and proceed with the sale, they were required to invoke an exception under Rocket's Insider Trading Policy. This exception permitted the reopening of a closed trading

window "at any time, as deemed appropriate by the General Counsel or other senior members of management." However, it appears that this critical decision was not made by the General Counsel, but rather relied on approval from management. Specifically, the Audit Committee authorized the reopening of the trading window for the benefit of Defendants RHI and Daniel Gilbert following discussions with RHI's then-CEO, Defendant Farner.

173.    In practice, the Company's Insider Trading Policy proved to be ineffectual, as Defendant Daniel Gilbert, acting through RHI, held the power to circumvent its restrictions. As Rocket's controlling shareholder, Defendants RHI and Daniel Gilbert exercised substantial influence over the company's board, senior management, and internal governance, including the application and enforcement of trading policies. Such a level of control, which enabled them to override standard procedures and facilitate trading activity during blackout periods, has been acknowledged in the Company's Form 10-K filings:

> We are controlled by RHI, an entity controlled by Dan Gilbert, whose interests may conflict with our interests and the interests of other stockholders. [] RHI is able to control any action requiring the general approval of our stockholders [].

174.    The reopening of the insider trading window, which was prompted by a request from RHI and authorized following discussions with Defendant Farner, who served as CEO of both RHI and Rocket, enabled Defendants RHI and Daniel Gilbert to sell 20.2 million shares of Rocket stock while in possession of material, nonpublic information, and before such information was disclosed to the market.

175.    Due to the overlapping leadership and operational control between RHI and Rocket, Defendants RHI and Daniel Gilbert had direct, real-time access to critical internal data. This included ongoing knowledge of Rocket's deteriorating Gain on Sale margin throughout the Relevant Period.

176.     Beyond its highly irregular timing, the Stock Sale also constituted a direct violation of Rocket's Insider Trading Policy. Under the Policy, trading is strictly prohibited at any time, even within an open trading window, if the individual is in possession of material, nonpublic information. The Policy provides, in relevant part:

> The prohibition against trading while aware of, or tipping of, material non-public information applies even during an open trading window. For example, if during an open trading window you are aware that a material acquisition is pending, you may not trade in the Company's securities. You should consult the General Counsel of Rocket Companies or a designee of the General Counsel whenever you are in doubt.

177.     Defendant Daniel Gilbert's awareness of Rocket's deteriorating financial outlook was further solidified on March 23, 2021, when Rocket's management presented a formal update to the Company's Board of Directors, of which Defendant Daniel Gilbert was a member. During that meeting, management disclosed its intention to revise guidance downward, including: (1) an anticipated decline in the Gain on Sale margin from 3.5% to 3.19%; (2) a projected $950 million reduction in annual revenue; (3) an estimated 80% drop in refinancing volume for the year; and (4) continued compression of the primary-secondary spread, significantly reducing profitability.

178.     Accordingly, when Defendants Daniel Gilbert and RHI proceeded with the Stock Sale on March 29, 2021, they did so while in possession of material, nonpublic information. This conduct violated both Rocket's Insider Trading Policy and the federal securities laws, including the Securities Exchange Act of 1934.

## DAMAGES TO ROCKET

179.     As a direct and proximate result of the Individual Defendants' conduct, Rocket will lose and expend many millions of dollars.

180.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and various of its current and/or former officers

and directors, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

181.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

182.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

183.    As a direct and proximate result of the Individual Defendants' conduct, Rocket has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

184.    Plaintiff brings this action derivatively and for the benefit of Rocket to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Rocket, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

185.    Rocket is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

186.    Plaintiff is, and has been at all relevant times, a shareholder of Rocket. Plaintiff

will adequately and fairly represent the interests of Rocket in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Rocket's Board consisted of the following eight individuals: Defendants Daniel Gilbert, Rizik, Shank, Jennifer Gilbert, and Mariner (the "Director-Defendants") and non-parties Alex Rampell ("Rampell"), Varun Krishna ("Krishna"), and Bill Emerson ("Emerson") (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was filed.

189.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. In yet further breach, Defendant Daniel Gilbert engaged in insider sales at artificially inflated prices, demonstrating his further motive for facilitating and participating in the fraud. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

190.    In complete abdication of their fiduciary duties, the Director-Defendants either

knowingly or recklessly caused or permitted Rocket to issue materially false and misleading statements. Specifically, the Director-Defendants caused Rocket to issue false and misleading statements which were intended to obscure Rocket's vulnerability to higher interest rates and the decreasing Gain on Sale margin and closed loan volume. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

191.    Additional reasons that demand on Defendant Daniel Gilbert is futile to follow. Defendant Daniel Gilbert founded Rocket Companies in 1985. From the Company's founding until 2002, Defendant Daniel Gilbert served as CEO of Rocket Mortgages. He also currently serves as a manager of Rocket Mortgages and served as the Chairman of its Board from 1985 to 2020. Additionally, since March 2020, Defendant Daniel Gilbert has served as a director and Chairman of the Company's Board. Thus, as the Company admits, he is a non-independent director. Furthermore, Defendant Daniel Gilbert is beholden to Defendant RHI and Rocket as the controlling shareholder of the Company through holdings in and control over RHI. Defendant Gilbert also serves as RHI's CEO, President, and Chairman of the Board. As the trusted Chaiman of the Board, Defendant Daniel Gilbert conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action. Furthermore, he engaged in lucrative insider trading while in possession of material

nonpublic information, obtaining personal profits of ***approximately $500 million***. For these reasons, too, Defendant Daniel Gilbert faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.     Additional reasons that demand on Defendant Rizik is futile to follow. Defendant Rizik has served as a Company director since March 2020. He also serves as the Chair of the Compensation Committee and as the Chair of the Nominating and Governance Committee. Defendant Rizik is beholden to Defendant RHI and Defendant Daniel Gilbert as a member of Defendant RHI's Board of Directors and as RHI's Treasurer, CFO, and Chief Tax Officer. Thus, as the Company admits, he is a non-independent director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rizik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.     Additional reasons that demand on Defendant Shank is futile to follow. Defendant Shank has served as a Company director since August 2020. She also serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee. Defendant Shank received and continues to receive handsome compensation for her role as a Company director. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Shank

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

194.     Additional reasons that demand on Defendant Jennifer Gilbert is futile to follow. Defendant Jennifer Gilbert has served as a Company director since March 2020. She also serves as a member of the Nominating and Governance Committee. As a member of the Gilbert family, Defendant Jennifer Gilbert is the spouse of Defendant Daniel Gilbert and is therefore beholden to him. She is also beholden to Defendant RHI and Defendant Daniel Gilbert as a member of Defendant RHI's Board of Directors since 2019. Thus, as the Company admits, she is a non-independent director. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Jennifer Gilbert is unlikely to take action against her husband, Defendant Dan Gilbert, who is a primary wrongdoer in this action. For these reasons, Defendant Jennifer Gilbert breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195.     Additional reasons that demand on Defendant Mariner is futile to follow. Defendant Mariner has served as a Company director since March 2020. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mariner breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.   Additional reasons that demand on non-party Krishna is futile to follow. Krishna is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with Rocket, thereby rendering him not independent. Moreover, the Company notes in its SEC filings that Krishna is not independent. As such, Krishna could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand against Krishna is therefore futile.

197.   Additional reasons that demand on non-party Emerson is futile to follow. Emerson is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's President, is an employee of the Company, and thus derives substantially all of his income from his employment with Rocket, thereby rendering him not independent. Moreover, the Company notes in its SEC filings that Emerson is not independent. As such, Emerson could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand against Emerson is therefore futile. Additional reasons that demand on the Board is futile follow.

198.   Demand in this case is further excused because two of the Director-Defendants are related and therefore lack independence from each other. Defendants Daniel Gilbert and Jennifer Gilbert are married, and as spouses, would be unlikely to take action against each other. As such, they are beholden to each other and therefore demand against them would be futile. Moreover, as discussed in the 2025 Proxy Statement, Daniel Gilbert holds 1,847,777,661 Holding Units and an equal number of shares of Class D common stock. He is the majority shareholder of RHI and has

shared voting and dispositive control, and beneficial ownership, with respect to the Holding Units and Class D shares. As such, the entire Board is beholden to Daniel Gilbert as a controlling shareholder, as they would be unlikely to take any action against him since he and the Director-Defendants would not be able to assess a demand with appropriate disinterestedness against them.

199. Defendants Shank, Mariner, and Tellem (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

200. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with

applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

201.     Rocket has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Rocket any part of the damages Rocket suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

202.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

203.     The acts complained of herein constitute violations of fiduciary duties owed by Rocket's officers and directors, and these acts are incapable of ratification.

204.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Rocket. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Rocket, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

205.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Rocket to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

206.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>FIRST CLAIM</u>
### Against the Individual Defendants and RHI for Breach of Fiduciary Duties

207.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208.    RHI and each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Rocket's business and affairs.

209.    RHI and each of the Individual Defendants violated and breached his, her, or itsfiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

210.    The Individual Defendants' and RHI's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants and RHI intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Rocket.

211.    In breach of their fiduciary duties owed to Rocket, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Rocket's Gain on Sale margin was declining; (2) the volume of closed loans, particularly refinance loans, was dropping significantly; (3) the Company was experiencing a reduction in its sales funnel and a decline in customer loan applications; (4) rising interest rates were negatively impacting Rocket's core refinancing operations and overall profitability; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

212.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

213.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

214.    RHI and Defendant Daniel Gilbert further breached their fiduciary duties to the Company because Defendant Daniel Gilbert, through RHI, sold 20.2 million shares of Company stock at artificially inflated prices based on material nonpublic information for ***total proceeds of***

*approximately $500 million*.

215.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

216.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

217.    As a direct and proximate result of the Individual Defendants' and RHI's breaches of their fiduciary obligations, Rocket has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and RHI are liable to the Company.

218.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

### <u>SECOND CLAIM</u>
### Against the Individual Defendants for Unjust Enrichment

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants

were unjustly enriched at the expense of, and to the detriment of, Rocket.

221.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Rocket that was tied to the performance or artificially inflated valuation of Rocket or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

222.    Plaintiff, as a shareholder and a representative of Rocket, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

223.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

224.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Rocket, for which they are legally responsible.

226.    As a direct and proximate result of the Individual Defendants' abuse of control, Rocket has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

228.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

229. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Rocket in a manner consistent with the operations of a publicly held corporation.

230. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Rocket has sustained and will continue to sustain significant damages.

231. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

232. Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

233. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

234. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

235. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

236. Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Daniel Gilbert, Farner, Booth, and Walters and RHI for Contribution Under Sections 10(b) and 21D of the Exchange Act

237.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

238.     Rocket and Defendants Daniel Gilbert, Farner, Booth, and Walters and RHI are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Daniel Gilbert's, Farner's, Booth's, and Walter's and RHI's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Rocket.

239.     Defendants Daniel Gilbert, Farner, Booth, and Walters and RHI, because of their positions of control and authority as officers, directors, and/or former officers of Rocket and, for RHI, of being controlled by Defendant Daniel Gilbert, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Rocket, including the wrongful acts complained of herein and in the Securities Class Action.

240.     Accordingly, Defendants Daniel Gilbert, Farner, Booth, and Walters and RHI are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

241.     As such, Rocket is entitled to receive all appropriate contribution or indemnification from Defendants Daniel Gilbert, Farner, Booth, and Walters and RHI.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Rocket, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Rocket;

(c)     Determining and awarding to Rocket the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Rocket and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Rocket and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Rocket to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Rocket restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: June 24, 2025

                  Respectfully submitted,

                  **THE BROWN LAW FIRM, P.C.**

                  */s/ Timothy Brown*
                  Timothy Brown
                  767 Third Avenue, Suite 2501
                  New York, NY 10017
                  Tel: (516) 922-5427
                  Fax: (516) 344-6204
                  Email: tbrown@thebrownlawfirm.net

                  *Counsel for Plaintiff*

## **VERIFICATION**

I, Erwin Gaa, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24  day of June, 2025.

Signed by:

Erwin Gaa